## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## NORTHERN DIVISION

| | |
|---|---|
| MYEISHA WASHINGTON, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )  Case No. 2:19-cv-00048-SNLJ |
| | ) |
| ANDREW M. SAUL, | ) |
| **Commissioner of the Social Security** | ) |
| **Administration,** | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM AND ORDER

The Commissioner of the Social Security Administration denied plaintiff Myeisha Washington's applications for disability insurance benefits and supplemental security income benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401, *et seq*. and Title XVI of the Social Security Act, 42 U.S.C. §§ 1381, *et seq*. Washington amended her alleged onset date of disability to a time after her expiration of insurance benefits, therefore she has waived any claims under Title II.[1] Washington now seeks judicial review on her Title XVI claim. The Commissioner opposes the motion. The issues being fully briefed, and for the reasons set forth, this Court will **AFFIRM** the Commissioner's decision.

---

[1] The ALJ found Washington's insured status ran through March 31, 2013. However, Washington amended her alleged onset date from December 30, 2006, to August 13, 2016. Because the amended onset date falls outside of the insured status period, Washington has effectively waived her Title II claim. *See Turpin v. Colvin*, 750 F.3d 989, 993 (8th Cir. 2014); *see also Durfee v. Colvin*, 2014 WL 1057216 at *1 (E.D. Mo. Mar. 14, 2014) (treating as waived claimant's Title II claim after she amended her allege onset date to fall outside of the insured period).

I.   **Procedural History**

Washington's application was denied at the initial determination level. She then appeared before an Administrative Law Judge ("ALJ"). The ALJ found Washington is not disabled because her symptoms were not supported by the medical evidence available. Washington then filed a request for review of the ALJ's decision with the Appeals Council of the Social Security Administration, which was denied. Thus, the decision of the ALJ stands as the final decision of the Commissioner. *See* 20 C.F.R. § 416.1481. Washington now seeks review by this Court pursuant to 42 U.S.C. § 405(g) and 42 U.S.C. § 1383(c)(3).

II.  **Disability Determination—The Five-Step Framework**

A disability is defined as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A). A claimant has a disability "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[.]" *Id.* § 1382c(a)(3)(B).

The Commissioner follows a five-step sequential process when evaluating whether the claimant has a disability. 20 C.F.R. § 416.920(a)(1). First, the Commissioner considers the claimant's work activity. If the claimant is engaged in substantial gainful activity, the claimant is not disabled. 20 C.F.R. § 416.920(a)(4)(i).

Second, if the claimant is not engaged in substantial gainful activity, the Commissioner looks to see whether "the claimant has a severe impairment [that] significantly limits [the] claimant's physical or mental ability to do basic work activities." *Hurd v. Astrue*, 621 F.3d 734, 738 (8th Cir. 2010); *see also* 20 C.F.R. § 416.920(a)(4)(ii). "An impairment is not severe if it amounts only to a slight abnormality that would not significantly limit the claimant's physical or mental ability to do basic work activities." *Kirby v. Astrue*, 500 F.3d 705, 707 (8th Cir. 2007); *see also* 20 C.F.R. §§ 416.920(c), 416.920a(d).

Third, if the claimant has a severe impairment, the Commissioner considers the impairment's medical severity. If the impairment meets or equals one of the presumptively disabling impairments listed in the regulations, the claimant is considered disabled, regardless of age, education, and work experience. 20 C.F.R. §§ 416.920(a)(4)(iii), (d).

Fourth, if the claimant's impairment is severe, but it does not meet or equal one of the presumptively disabling impairments, the Commissioner assesses whether the claimant retains the "residual functional capacity" (RFC) to perform his or her past relevant work. 20 C.F.R. §§ 416.920(a)(4)(iv), 416.945(a)(5)(i). An RFC is "defined as what the claimant can still do despite his or her physical or mental limitations." *Gann v. Berryhill*, 864 F.3d 947, 951 (8th Cir. 2017); *see also* 20 C.F.R. § 416.945(a)(1). While an RFC must be based "on all relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of his limitations," an RFC is nonetheless an "administrative assessment"—not a medical

3

assessment—and therefore "it is the responsibility of the ALJ, not a physician, to determine a claimant's RFC." *Boyd v. Colvin*, 831F.3d 1015, 1020 (8th Cir. 2016). Thus, "there is no requirement that an RFC finding be supported by a specific medical opinion." *Hensley v. Colvin*, 829 F.3d 926, 932 (8th Cir. 2016).  Ultimately, the claimant is responsible for *providing* evidence relating to his RFC and the Commissioner is responsible for *developing* the claimant's "complete medical history, including arranging for a consultative examination(s) if necessary, and making every reasonable effort to help [the claimant] get medical reports from [the claimant's] own medical sources."  20 C.F.R. § 416.945(a)(3).  If, upon the findings of the ALJ, it is determined the claimant retains the RFC to perform past relevant work, he or she is not disabled.  20 C.F.R. § 416.920(a)(4)(iv).

Fifth, if the claimant's RFC does not allow the claimant to perform past relevant work, the burden of production to show the claimant maintains the RFC to perform work that exists in significant numbers in the national economy shifts to the Commissioner. *See Brock v. Astrue*, 574 F.3d 1062, 1064 (8th Cir. 2012); 20 C.F.R. § 416.920(a)(4)(v). If the claimant can make an adjustment to other work that exists in significant numbers in the national economy, the Commissioner finds the claimant not disabled.  20 C.F.R. § 416.920(a)(4)(v).  If the claimant cannot make an adjustment to other work, the Commissioner finds the claimant disabled.  *Id.*  At Step Five, even though the *burden of production* shifts to the Commissioner, the *burden of persuasion* to prove disability remains on the claimant. *Hensley*, 829 F.3d at 932.

4

**III.     The ALJ's Decision**

At Step One, the ALJ found Washington met the insured status requirements through March 31, 2013, and had not engaged in substantial gainful activity since August 13, 2016. (Tr. 14). At Step Two, the ALJ found Washington suffers from four medically determinable impairments: (1) migraines; (2) learning disability; (3) mood disorder; and (4) depression. (Tr. 14). At Step Three, the ALJ concluded Washington does not have an impairment or combination of impairments that meets or equals one of the presumptively disabling impairments listed in the regulations. (Tr. 15-17).

Next, in beginning the analysis of Step Four, the ALJ determined Washington's RFC.[2] The ALJ found that Washington

> has the residual functional capacity to perform a full range of work at all exertional levels but with the following non-exertional limitations: the claimant can never climb ladders, ropes, or scaffolds; she cannot be exposed to unprotected heights or hazardous work environments; the claimant is limited to remembering and carrying out simple, routine tasks and making simple work-related decisions; she cannot perform production pace tasks that require strict hourly goals; the claimant can have occasional contact with supervisors and brief incidental contact with co-workers and the general public; she must avoid concentrated exposure to noise above a moderate level as defined by Appendix D of the Selected Characteristics of Occupations, as well as to bright flashing or flickering lights; the claimant will be off task five percent of an eight-hour workday.

---

[2] Determining claimant's RFC is "essential to properly completing steps four and five." *Swink v. Saul*, 931 F.3d 765, 769 (8th Cir. 2019). However, the RFC is determined at step four—a point in which the burden of proof rests with claimant. *See Scott v. Berryhill*, 855 F.3d 853, 855 (8th Cir. 2017); *Goff v. Barnhart*, 421 F.3d 785, 793 (8th Cir. 2005).

5

(Tr. 17).  As part of this determination, the ALJ found Washington's allegations about her physical and mental symptoms' intensity, persistence, and limiting effects were not consistent with the medical records when considered as a whole. (Tr. 18). The ALJ remarked that Washington's daily activities simply did not comport with the limitations described by her and some of her providers—noting "scant evidence" that her disabilities cause her to have "significant functional limitations in her day-to-day life." (Tr. 19). The ALJ also highlighted "normal" and "unremarkable" objective testing (i.e. MRI scans, electroencephalogram, CT scans, etc.) and "little evidence" of continued treatment, inpatient treatment, and emergency assistance. (Tr. 18, 20). Washington was further noted for her repeated non-compliance with prescribed medications. (Tr. 21). And while Washington was attributed with an IQ score of 57 (based on the WAIS-IV), the "examiner noted, in speaking with [Washington] and observing her frustration with the test, that he did not believe the score to be reliable." (Tr. 19). In fact, one of Washington's relied-upon providers concluded she had a Global Assessment of Function (GAF) score of "55 to 60, which is consistent with [only] mild to moderate limitations." (Tr. 23).[3] Ultimately, the ALJ found that some of Washington's alleged symptoms were supported, but "objective findings and treatment patterns provide no more than partial support for [their] severity"—symptoms, when properly limited, that the ALJ "accounted for" by including "multiple limitations" in the RFC. (Tr. 21).

---

[3] Based on subjective assessments, GAF scores are of limited evidentiary value—a point noted by this Court in the past. *See Hill v. Berryhill*, 2018 WL 6696636 at *5 (E.D. Mo. Dec. 20, 2018). However, the GAF score, here, is useful as cumulative evidence to contradict Washington's alleged IQ score, which taken alone would indicate significant functional limitations.

Having made an RFC determination, the ALJ continued on through Step Four to determine whether Washington could perform her past relevant work in light of her designated RFC. The ALJ determined Washington is unable to perform any past relevant work. (Tr. 23).

At Step Five, the ALJ analyzed whether Washington can successfully adjust to other work. The ALJ noted that if Washington could perform all or substantially all of the exertional demands at a given level under the Medical-Vocational Guidelines (the "Grids"), 20 C.F.R. Part 404, Subpart P, Appendix 2, then the Grids would direct a conclusion of whether Washington was "disabled" or "not disabled." The ALJ acknowledged, however, that additional limitations impede Washington's ability to perform work at all or substantially all of the assigned level.  Thus, the ALJ relied on vocational expert (VE) testimony to determine the extent to which these limitations erode Washington's occupational base to perform "unskilled work at all exertional levels."  The VE testified Washington could perform work as a "folder," "laundry sorter," and "housekeeper cleaner" even after considering all of the limitations in Washington's RFC. (Tr. 24).  The ALJ then found these jobs exist in significant numbers in the national economy and concluded Washington is not disabled. (Tr. 24).

**IV.    Standard of Review**

The Court must affirm the Commissioner's decision if it is supported by substantial evidence on the record as a whole.  42 U.S.C. §§ 405(g); 1383(c)(3). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S.Ct. 1148, 1154 (2019).

7

"[T]he threshold for such evidentiary sufficiency is not high." *Id*. Under this test, the court "consider[s] all evidence in the record, whether it supports or detracts from the ALJ's decision." *Reece v. Colvin*, 834 F.3d 904, 908 (8th Cir. 2016). The court "do[es] not reweigh the evidence presented to the ALJ" and will "defer to the ALJ's determinations regarding the credibility of testimony, as long as those determinations are supported by good reasons and substantial evidence." *Id*. The ALJ will not be "reverse[d] merely because substantial evidence also exists in the record that would have supported a contrary outcome, or because [the court] would have decided the case differently." *KKC ex rel. Stoner v. Colvin*, 818 F.3d 364, 370 (8th Cir. 2016).

**V.     Discussion**

Washington seeks remand on two issues.

First, she says the ALJ erred in assessing her RFC by "creating [it] from whole cloth" and "cherry-pick[ing] items from the [] record." She says the ALJ too strongly relied on her daily activities and ignored records that "consistently note that [she] has abnormal insight and judgment" and show how she "failed at many jobs due to her mental illness and inability to deal with the public, co-workers, and supervisors."

Second, Washington says the ALJ erred when giving insufficient weight to the opinions of treating nurse Geoff Westhoff and examining psychologist Dr. Thomas Spencer. Both indicated Washington suffers more severe symptomology than attributed by the ALJ. By choosing to "ignore significant parts of [their] findings," Washington says the ALJ is "playing doctor" and ended up having "no opinion to support her RFC" except for her own.

8

### A. The ALJ Properly Evaluated Claimant's RFC

While providing an illustration or two about how the ALJ misconstrued the record in formulating Washington's RFC—arguing, for example, that the record shows she has a "hard time driving" compared to the ALJ's generalized comment that "the claimant drove around for two days looking for houses [to buy]"—the thrust of Washington's argument is that she is more functionally limited than her daily activities, relied upon heavily by the ALJ, would suggest. In essence, Washington accuses the ALJ of myopically viewing the record, taking only the bad, so as to guarantee a denial of benefits. But when viewing the record as a whole, it is clear this becomes an evidentiary dispute and, of course, it is not "the role of this Court to reweigh the evidence presented to the ALJ." *Dols v. Saul*, 931 F.3d 741, 746 (8th Cir. 2019). Indeed, even assuming Washington is correct about the driving example, for every circumstance Washington points to in arguing the ALJ "cherry-picked" from and misapplied the record, she herself ignores conclusions drawn by the ALJ that show she is not disabled. Washington makes no mention, for example, about the ALJ's citation to the record indicating repeated non-compliance with medication. "A failure to follow prescribed medical treatment without good cause is a basis for denying benefits." *Kelley v. Barnhart*, 372 F.3d 958, 961 (8th Cir. 2004). And she does nothing to challenge the ALJ's conclusions that she has a remarkable ability to "plan[] and organiz[e]" her daily routines—doing everything from "providing babysitting services for two infant[s]" to "handl[ing] the family's finances." In fact, she does much more: preparing meals, doing household chores, shopping weekly, attending "mommy groups" and church events, planning large family get-togethers, attending dance recitals

9

and football games with her children, orchestrating a plan to improve her and her husband's credit scores, and coordinating the many logistical headaches associated with searching for, obtaining a loan for, and moving into a new home. While not dispositive alone, daily activities—many, here, that Washington chooses to ignore—can be used to "support[] the conclusion that the claimant [] is not [] disabl[ed]." *Schuler v. Berryhill*, 2019 WL 1569226 at *5 (E.D. Mo. Apr. 11, 2019).

The record also shows things the ALJ did not capture in her opinion, but are no less cumulatively harmful to Washington's argument. For example, one provider noted how Washington and her husband "discussed her trying to get a job," but Washington "decided it was best to continue to scrape along and use community resources to get bills paid" so that it did not affect her disability hearing. (Tr. 686). On another occasion, it was noted that Washington didn't "know what [she] will do with [her] extra time," but that she didn't "want to look for part-time employment" or take a "job that [she] hate[s]." (Tr. 645, 649). There are also several indications that financial concerns animated Washington's drive to seek social security benefits. (Tr. 641, 670, 682, 686). A lack of motivation to work "raises some questions as to whether the current unemployment is truly the result of [allegedly disabling] medical problems." *Julin v. Colvin*, 826 F.3d 1082, 1087 (8th Cir. 2016).

Ultimately, the premise of Washington's argument is sound. In evaluating an ALJ's RFC determination, this Court must inquire whether it is "supported by substantial evidence," and that inquiry requires a consideration not of isolated examples but, instead, of the *total* record to include provider notes, treatment and testing results, daily activities,

10

and the opinions of medical consultants. *Despain v. Berryhill*, 926 F.3d 1024, 1028-1029 (8th Cir. 2019). But, Washington falls prey to her own criticisms—focusing on certain, supportive evidence in her brief to the exclusion of other, adverse evidence relied on by the ALJ. Casting aside evidentiary quibbles, this Court finds the total record provides substantial evidence supporting the ALJ's decision. The ALJ recognized Washington had some mental limitations (based on unspecified "mood disorders" and "learning disabilities") and accounted for them by limiting Washington to "simple, routine tasks" and only "occasional contact with supervisors." But, highlighting many of the things Washington *can* do on a day-to-day basis, as well as benign testing results and unaggressive treatment routines, the ALJ was within the "available zone of choice" to conclude that Washington was not disabled. *Twyford v. Commissioner*, 929 F.3d 512, 518 (8th Cir. 2019) (claimant's adverse treatment records and daily activities constituted substantial evidence supporting the ALJ's designated RFC, which fell within the ALJ's "available zone of choice" in weighing the evidence).

### B. The ALJ Did Not Err in Partially Discrediting the Medical Opinions of Westhoff and Spencer

As an initial matter, Westhoff—as a nurse practitioner—was not an "acceptable medical source" as defined by the regulations that apply to Washington's case and, thus, was not entitled to "controlling weight." *See* 20 C.F.R. §§ 416.913(a) (2016) (excluding nurse practitioner from the list of acceptable medical sources), 416.927(a)(2), (c) (limiting "controlling weight" to "acceptable medical source[s]"); *Lacroix v. Barnhart*, 465 F.3d 881, 886 (8th Cir. 2006) (holding that nurse practitioner was not an "acceptable

medical source"). Washington seems to recognize this possibility by pointing out that new rules have taken effect since March 27, 2017, and that Westhoff's opinion was rendered on January 19, 2018. Is it true that the rules have been rewritten; in fact, they "changed the method of evaluating a [provider's] opinion away from assigning specific weight." *Baker v. Saul*, 2019 WL 7282115 at *3 n.2 (E.D. Mo. Dec. 27, 2019). So, it is perplexing why, in advocating the applicability of the new rules, Washington continues to focus on the weight-assigning regime. But, in any event, even if nurse practitioners—or so-called "advanced practice registered nurse[s]"—are now included as acceptable medical sources, that recognition is expressly limited to "claims filed on or after March 27, 2017." 20 C.F.R. 416.902(a)(7) (2018). And "claims filed" is said to mean when "an application for SSI benefits … is received by an employee at the social security office"—not when a provider renders an opinion. 20 C.F.R. § 416.325(a). All this is to say that the old regime was not totally abandoned, does in fact apply to Washington's claims (filed on August 31, 2016), and therefore limits the evidentiary value of Westhoff's opinions. *See Lacroix*, 465 F.3d at 886 (ALJ did not err in giving nurse practitioner's opinions "no weight"); *see also Rivera-Capeles v. Saul*, 2019 WL 4635662 at *3 (E.D. Wis. Sept. 24, 2019) (nurse practitioner was not an "acceptable medical source" where claim was filed prior to March 27, 2017).

     Washington primarily relies on a medical source statement created by Westhoff that concludes, without citation to objective or longitudinal evidence in the record, that Washington suffers from several "extreme impairments" limiting her ability to work. (Tr. 560-563). But, as this Court has previously noted, "[t]here is [] a well-documented

12

skepticism of medical source statements that constitute checkbox-format conclusions and the ALJ is encouraged to look upon them with a critical eye." *Meyer v. Berryhill*, 2019 WL 1429335 at *5 (E.D. Mo. Mar. 29, 2019) (Limbaugh, J.) (citing *Adkins v. Commissioner,* 911 F.3d 547, 550 (8th Cir. 2018)). Indeed, the ALJ is empowered to discount a medical source statement that is "contradicted by other objective medical evidence in the record." *Adkins*, 911 F.3d at 550. Like in *Meyer*, the ALJ highlighted contrary medical evidence, normal diagnostic testing, and inconsistent daily activities as reasons to give only limited weight to Westhoff's opinions. As but one example, Westhoff says Washington "isolates herself from others" and has "poor focus and anxiety," which has caused her to have an inability to "carry out [complex] multi-step instructions." (Tr. 561). But, the record—particularly a series of medical notes occurring longitudinally over many months in 2017—indicates Washington is regularly engaged in social activities outside the home, including attending social groups and church functions, departing for out-of-town weddings, going to the YMCA to work out, taking trips to Florida, Six Flags, and unspecified "caves" with her kids, having people over for barbeques and holiday events, watching her kids' sporting events, and generally keeping "busy ever weekend." (Tr. 582, 621, 629, 633, 661-662, 698, 742). One medical note specifically praised how Washington was "getting along well with everybody" (Tr. 698), while another praised her for finding "fun and positive socialization opportunit[ies]." (Tr. 662). The record further indicates Washington is quite capable at carrying out multi-step tasks, such as coordinating multiple moves with her family—to include house searching, contacting and negotiating with landlords and utility companies, saving money and

13

planning to improve her family's credit score for loan approvals, organizing the move itself (packing and unpacking), and decorating. (Tr. 582, 590, 594, 602, 606, 610 613, 617, 625, 718, 730, 734, 738). Again, it is Washington who takes on the onerous task of "handling the family's financials," which tends to refute the "extreme" limitations declared by Westhoff. The ALJ did not err in using this conflicting information to partially discredit Westhoff's otherwise conclusory medical source statement. *See Adkins*, 911 F.3d at 550; *Toland v. Colvin*, 761 F.3d 931, 935-936 (8th Cir. 2014) (claimant's daily activities gave ALJ sufficient cause to attribute only "little weight" to provider's conclusory medical source statement)

Less attention was given to Dr. Spencer's opinions in Washington's brief, which attempted to argue that Spencer's IQ testing confirmed the extreme limitations referenced in Westhoff's medical source statement. But, Spencer himself acknowledged the unreliability of the IQ test he administered, commenting that Washington's "frustration with the testing" led him to belief that the score was an unreliable estimate of her "current functioning." (Tr. 553). In fact, the ALJ gave partial weight to Spencer when he found Washington was only mild-to-moderately limited in her ability to carry out and understand simple tasks and make appropriate work-related decisions, which is at odds with Westhoff's conclusions and more reason to afford the ALJ deference upon conflicting evidence. (Tr. 22, 556, 560). What the ALJ rejected, though, was Spencer's conclusions that Washington was "markedly" limited in her ability to interact with others and follow complex instructions; the ALJ found that "subsequent records run contrary to these opinions." (Tr. 22). In essence, the ALJ rejected Spencer's conclusions for the same

14

reason Westhoff's conclusions were rejected—his medical source statement (notably undated and unsigned) was conclusory and simply did not comport with the available evidence regarding Washington's daily abilities as well as her unremarkable, and sometimes outright contrary, treatment records. For the same reasons the ALJ did not err as to Westhoff, the ALJ did not err as to Spencer. There is simply no meaningful support in the record that compelled the ALJ to find in favor of the substantial limitations imposed in either provider's medical source statements.

## VI. Conclusion

This Court's review is limited to determining whether the ALJ's findings are based on correct legal standards and supported by substantial evidence. It does not substitute its own judgment for that of the ALJ. *Gann v. Berryhill*, 864 F.3d 947, 950 (8th Cir. 2017). Having found the ALJ's conclusions were supported by substantial evidence and that legal standards were correctly applied, this Court affirms the ALJ's decision.

Accordingly,

**IT IS HEREBY ORDERED** that the Commissioner's decision is **AFFIRMED** and plaintiff Myeisha Washington's complaint (ECF #1) is **DISMISSED with prejudice**. A separate judgment accompanies this Order.

So ordered this 5th day of May 2020.

_____
STEPHEN N. LIMBAUGH, JR.
UNITED STATES DISTRICT JUDGE